TubNEY, J.,
delivered the opinion of the Court.
*306 The Constitution of 1870, art. 10, s. 4, in its provision for the establishment of new counties, amongst •other things, declares: “No part of a county shall be taken off to form a new county, or a part thereof, without the consent of two-thirds of the qualified voters in such part taken off.”
On the 16th of December, 1870, the Legislature passed an act, entitled “ an act to establish the •county of Bell, in honor of that distinguished statesman, patriot and son of Tennessee, the late Hon. John Bell.”
This act defines in terms the boundaries of said ■county, and appoints commissioners, (the defendants,) prescribing their duties in the organization of said county, amongst them providing, “that said commissioners be and they are hereby directed to cause an election to be held, after giving twenty days’ notice at such time as they may deem best, in three or mo.re places in each of the fractions stricken off from Hardeman and Fayette and one in McNairy county, for the purpose of ascertaining whether a constitutional majority of the people residing in these fractions are in favor of or opposed to the establishment of Bell county; and all male citizens of the United States and of this State, of the age of twenty-one years, and being a resident in said fraction in which he may offer his vote six months next preceding the day of election, shall be entitled to vote,” etc., etc.
After having advertised the twenty days, the commissioners on 22d February, 1871, proceeded to hold an election as provided for in said act, with the result *307 for “New Comity” 623 votes, for “Old Comity” 123 votes, making a total of votes cast 746.
In April, 1871, complainants, ^ Justices of the Peacé for Fayette county, filed this bill, charging, with other allegations, “that the facts show that two-thirds of the qualified voters living in said fraction taken from Fay-ette did not vote for the establishment of Bell county,” and praying that the commissioners be enjoined from further proceeding in the matter of organizing' the county, and that the fraction taken off from Fayette be restored, etc.
To this bill there was full answer, containing causes of demurrer, which were set for argument; those necessary to be noticed under the view we have taken, are:
1. Because all the material allegations are upon information and belief, and the affidavit is to the best of affiant’s knowledge, information and belief.
2. Because the Constitution does not require two-thirds of the whole number of voters who actually reside in the fraction, but only two-thirds of those who vote.
As to the first ground, the two parts making substantially the same ground, we answer, that if a matter essential to the determination of the plaintiff’s claim is charged to rest in the knowledge of the defendant, or must of necessity be within his knowledge, and is consequently the subject of a part of the discovery sought by the bill, a precise allegation is not required. Such is the rule as announced by both Mitford and Story in their works on Equity Pleading.
The defendants come very clearly within it. They *308 were the parties designated by law, witb tbeir duties defined to complete the establishment of the county. Certain facts are alleged which, if true, it is insisted makes them guilty' of a neglect or violation of duty, When they undertook the discharge of those duties, they were compelled to have done every thing necessary to their perfect execution; therefore the facts of commission or omission attending their action must of necessity be within- their knowledge.
If a contrary rule obtained it would frequently fall out that parties whose rights are being appropriated or trespassed upon by another, could find no relief by invoking the extraordinary aid of Courts of Equity restraining the injurious act until the right of property or possession could be determined by the Courts. As for instance, in cases of absence from the place at the time of the wrong complained of, individual ignorance of the facts constituting the wrong, the doing of an act injurious to another under the' pretence or even with the honest belief that it is done in pursuance of a lawful right or power; as where a party in interest may reasonably doubt of the legal construction to be given to the act, and the like, demonstrating the correctness of the rule we have repeated.
The second assignment will be noticed when we speak of the merits — it controls the case.
The Chancellor overruled the demurrer and the cause was heard upon an agreed state of facts, which is, that although more than two-thirds of those who voted on the 22d of February voted in favor of the new county, yet the number so voting was not equal to *309 two-tbirds of tbe qualified voters in the part taken off. It is insisted by complainants that there must be at least an actual consent of an entire two-thirds of the qualified voters. And by defendants that two-thirds of the votes cast is the meaning of the Constitution, and must control without regard to those entitled to, but who do not vote.
Article 4, s. 1, of the Constitution, defines qualified voters to be: “Every male person of the age of twenty-one years, being a citizen of the United States and a resident of this State for twelve months, and of the county wherein he may offer his vote for sis months next preceding the day of election. * * * * And there shall be no qualification attached to the right of suffrage, except that each voter shall give to the judges of election where he offers his vote satisfactory evidence that he has paid the poll taxes,” etc.
The object, of construction as applied to a written Constitution is to give effect to the intent of the people adopting it. In the case of all laws, it is the intent of the law-giver that is to be enforced. But this intent is to be found in the instrument itself, It is to be presumed that language has been employed with sufficient precision to convey it, and unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it. Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the Legislature should be intended to mean what it has plainly expressed, and consequently no room is left for construction.
*310 Possible or even probable' meanings, wben one is plainly declared in the instrument itself, the Courts are not at liberty to search for elsewhere: Cooley’s Constitutional Limitations, pp. 55-6.
It is the duty of Courts to apply this rule with all its force and meaning, to constitutional more especially, than to legislative enactments, the latter is the subject of ready and easy change, modifications, explanation or repeal. While the former is organic, the test by which all other law must be tried, the chart by which the law-making power must be governed, and is for wise reasons, slow, cumbrous and expensive in alteration or amendment.
The language of the clause is plain and unambiguous. “No part of the county shall be taken off without the consent of two-thirds of the qualified voters in such part.” The word “consent” here means the active concurrence, and can not be substituted for by a passive acquiescence. The argument that two-thirds of the votes cast, and the authorities persuasive to that view of the question can be of no service here. First, and mainly because it is not contemplated by the framers of the Constitution that the “consent” shall be ascertained by ballot any more than it was, that it should be arrived in any other mode the Legislature may have seen proper to adopt, and to hold that a two-thirds vote of those who attended the election and cast their ballots shall determine the matter, would be to hold that an election in the ordinary way, is the only mode in which the consent required may be obtained or made certain, this would place the Legisla *311 ture above tbe Constitution and independent of tbe people. Tbe fact tbat tbe Constitution demands in general terms tbe consent of two-tbirds and fixes no means of getting at tbat consent, but leaves tbe means to an enabling act of tbe Legislature, is of itself conclusive tbat it intends its language to bave tbe active construction tbat two-tbirds shall speak affirmatively.
In the instrument itself we bave positive authority for tbe interpolation already given. In art. 2, s. 27, it is provided, “But tbe credit of. no county, city or town shall be given or loaned to or in aid of any person, company, association or corporation, except upon election to be first held by the qualified voters of such county, city or town, and tbe assent of three-fourths of the votes cast at said election, nor shall any county, city or town become a stockholder with others in any company, association or corporation, except upon a like election and the assent of a like majority.”
Here we have an expression for elections tbat shall be binding upon those not voting, and in it tbe milder term “assent” is used, because their actual approbation is not required as in tbe clause under consideration.
Having in this clause prescribed tbe mode in which tbe people may proceed to onerate themselves with burdens of taxation in terms understood by themselves without tbe aid of argumentative construction. We must conclude tbat tbe clause before us, being of a nature kindred to tbe one just referred to, was intended to be equally clear and certain, expressing on its face tbe full and true intent and meaning of the instrument containing it. We can not presume that *312 the framers of the Constitution did not understand the force of this language, or that they meant 'the plain and unambiguous expressions employed to mean more or less than their face imparts.
In this connection, we may adopt the language of the Supreme Court of Indiana: “This power of construction in Courts is a mighty one, and unrestrained by settled rules, would tend to throw a painful uncertainty over the effect that might be given to the most plainly worded statute,” (here Constitution) “and render the Courts in reality the legislative” (here Constitution making) “power of the State.” In amplification of this idea, we appropriate the language of Mr. Justice Bronson in Peoples v. Purdy, 2 Hill. “In this way, a solemn instrument — for so I think the Constitution should be considered — is made to mean one thing by one man, and something else by another, until, in the end, it is in danger of being rendered a dead letter, and that, too, when the language is so plain and explicit that it is impossible to mean more than one thing, unless we first lose sight of the instrument itself, and allow ourselves to roam at large in the boundless fields of speculation. For one, I dare not venture upon such a course. Written constitutions of government will soon come to be regarded as of little value, if their injunctions may be thus lightly overlooked, and the experiment of settling a boundary to power will prove a failure.”
If this warning — in language we are tempted to call prophetic — had been heeded, we might to-day, as did Judge Caruthers in 1854, have boasted: “There is *313 no ‘higher law’ than the Constitution. This is the supreme and paramount law, before which all must bow with reverence.”
The case of Louisville & Nashville Railroad Company v. The County Court of Davidson et als., relied on by defendants, is not in conflict with this opinion. We fully concur in the argument of that ease, and think the construction given by it to the clause of the Constitution and Act of Assembly therein discussed the true one.
If, as insisted under the authority of that case, it were held in this that the consent of two-thirds meant those actually voting, it would be declaring that, if out of a population of more than twelve hundred qualified voters three only attended the election and voted, two for the new county and one against, such two-thirds vote established the new county.
The statement of the proposition overthrows it. Instead of presuming that those who did not vote in the election meant by their non-action to submit to the result of a count of the votes cast, we hold that a proper reading of the Constitution and enabling act authorizes those who did not vote to conclude that their votes against the project could avail nothing as a fixed, affirmative, numerical strength was absolutely necessary to the success of the new county. Such is the law.
The decree of the Chancellor disallowing the demurrer, and making the injunction perpetual, is affirmed.